15-1385 NL. Murray Energy Corporation Petitioner v. Environment Protection Agency. Good morning. Good morning. Seth Johnson for Health and Environmental Petitioners. We're challenging three ways EPA failed to protect public health and welfare in the 2015 OZONE Standards Rule. I'd first like to talk about the primary standard, the health standard, and how EPA illegally and arbitrarily set it to allow ozone levels that are harmful to human health. Then I plan to talk about how EPA set an illegally and arbitrarily weak secondary standard rather than protecting public welfare. And finally, I'll talk about EPA's creation of a grandfathering waiver that allows certain new sources of air pollution to violate the new standards. The health standard. A fundamental pillar of EPA's rationale for the rule of ozone that EPA agrees causes adverse effects when people are exposed to it over eight hours. But to reach this conclusion, EPA arbitrarily got rid of KASAC's advice as well as evidence from controlled human experiments that showed that eight-hour levels of ozone caused adverse effects. Then EPA unlawfully and arbitrarily wrote off the undisputed fact that its weak standard allows adverse health effects anyhow because of the combination of form and level that EPA selected. I'll start with how the standard allows adverse effects to occur under even EPA's own calculations. EPA found that an eight-hour level of 72 parts per billion of ozone causes healthy young adults to suffer adverse health effects. In fact, EPA agrees that the majority of healthy young adults exposed in the lab to 72 parts per billion actually experienced adverse health effects. But EPA defines the standard so that areas can satisfy it, yet repeatedly have ozone levels at or above the 72 parts per billion level. Are you saying that the statute requires them to set the standard such that an area, to be in compliance, the area can never exceed that standard on any given day? What the act requires, and under this court's case law, is a standard that ensures the absence of adverse effects on sensitive subpopulations. And that's from this court's case law in Coalition of Battery Recyclers from 2010, American Lung Association in 1998, and Lead Industries Association. EPA hasn't done that here. EPA has set a standard that it knows allows adverse health effects. It's set a standard that areas that comply with the standard have tens of days at or above the 72 parts per billion level. Okay, well, what about my question? They're not allowed – the standard can't allow for one day? Is that what you're saying? The standard has to ensure an absence of adverse effects on sensitive subpopulations. And so once EPA identifies a level – EPA has to set a number. So I'm asking you how they set that number. Do they set that number by saying there can't be one day? The problem here is the combination of form and level. They could set a level – they could set a form where the level they set could be exceeded sometimes, but it can't exceed a level that causes adverse health effects. They could set the level lower and change the form. They have options. The problem here is that EPA set a standard that it knows allows multiple days with harmful levels of ozone, including levels above 80, 90, or 100 parts per billion, all of which are levels that EPA agrees cause a range of adverse health effects, including breathing problems so severe that they send people to the hospital. And EPA agrees with all of this. EPA has set – EPA acknowledges that 72 parts per billion ozone causes adverse health effects. EPA agrees that the standard allows these dangerous exposures. And EPA's own calculations show that hundreds of thousands of children will experience dangerous exposures in dangerous ways in any given year, with tens of thousands of them experiencing it that the standard prevents – that the standard meets its obligations of preventing adverse health effects. Mr. Johnson, on the secondary standard, could you explain a little bit more how the two different aspects of the standard interact? You argued that they – that EPA informally will use a three-year average without lowering the average to account for some of the annual spikes. And you also argued that it should have used the W126 cumulative average instead of the exceedances during individual days standard that's part of the primary standard. How would – do they both have to be dealt with together? If the EPA had used the cumulative one-year – or the one-year approach, could it have then used the same – not used the W126 standard? I don't think so. KSAC's advice – KSAC gave advice about both of those points, and I'll try to address them separately. I'll start with the cumulative form. KSAC advised – and EPA agrees – that the cumulative form is the appropriate metric for the secondary standard. This is because ozone harms plants and people differently. It harms plants over the span of the growing season. It harms people, EPA says, over an eight-hour period. And KSAC advised that the strategies to meet an eight-hour standard aren't the same strategies that will lead to compliance with a cumulative form. And so there's just a mismatch, and this is confirmed by the air quality data, which shows there's actually a mismatch. And it's – they're just different processes of harm. It's not that humans are also cumulatively harmed. I mean, I guess one way of looking at it is if humans are the more sensitive of the two, then isn't the standard that we apply, the primary standard, protective also of the harms to public welfare? Or is it different? People bounce back, and trees sort of don't. They cumulatively suffer. Trees take in the ozone all throughout – trees are outside all day. All day. And over the span of the growing season, they take in ozone, and that harms their growth over the span of a growing season. And I guess my question is, are humans not? I mean, if you are outdoors and you have some lung decrement and then you go back in for a while, does that go away? Or is the next time you go outside, you're going to be – it's going to be getting worse and worse, just more intermittently? Do we know that from this record? I'm not sure I saw anything on that. The harm – the human health harm EPA focused on here was the eight-hour breaks. Right. So that's what it focused on. But your argument about the trees, to me, seems a little contrary to your argument about how EPA shouldn't have looked at exposure assessment data, because you're arguing that there should be a different standard for trees because trees are exposed more. But when EPA looked to see how people are actually exposed to the air and how they act in or when they're outside, et cetera, you say that they can't look at that because they're just supposed to set a level that says that the air can't get above a certain amount of ozone. How do you square what I think is the tension in your two positions? Well, I don't – we didn't rely on the same exposure assessment for welfare risks that – or for welfare that – sorry, let me start that again. When EPA concluded that eight hours of ozone harms human health, that 72 parts per billion of ozone over a 6.6-hour exposure harms human health, that was based on controlled human experiments. When it finds that ozone harms growing plants, that was also based on controlled experiments at facilities in various parts of the country. It was also based on various studies. So both of them are based – the question of how they're harmed, that's both based on – both of those are based on actual data. What EPA said is let's look at whether and how many people are actually outside and exposed to the air on a given day. I mean, it's one thing to say, okay, if we do a controlled experiment where we have people breathe air with a specific amount of ozone and we know what harm that will cause, that's fine. But EPA sought to try to figure out, does that really happen, and how much does it happen, and to whom does it happen, and under what circumstances does it happen. What's wrong with that? It's not how Congress directed the standards to be set. Congress provided guidance about how standards have to be set. It said that there has to be an absence of adverse effect demonstrated through ordinary statistical means. And EPA didn't make that finding here. EPA couldn't make that finding here. EPA found that there's adverse effect in these lab studies on the majority of healthy young adults. And the lab studies – But if there's a high level of ozone in the mechanical room of this courthouse that's dangerous and that would have adverse effects, but it only affects people who are entering into that mechanical room, it's not having adverse effects to you and I and everybody else who never goes in there. I mean, isn't it relevant to – you can't just look at this, you know, that specification in the vacuum. Right. The lab studies that EPA relied on here are simulating moderate exercise over the course of the day. They're simulating what an outdoor worker would do over the course of the day. They're simulating what an active child would do over the course of the day. They're simulating what a recreationalist would do over the course of the day. These are ordinary activities. And EPA is relying on a simulation that's on top of a simulation that's on top of assumptions in order to try to write that off. And that's not consistent with what the Clean Air Act says. It's not consistent with this court's holdings. It's not consistent with the guidance that Congress provided to EPA in the 1970 Senate report about how standards have to be set. That's where Congress said there's got to be an absence of adverse effect on the health of a statistically related sample of persons in sensitive groups from exposure to the ambient air. EPA here found that there are adverse health effects to a statistically related group of healthy people from exposure to levels of ozone pollution that occur in the ambient air when people are doing ordinary activities. And I'm sorry. I got you off track of Judge Pillard's questions about the secondary standards. Well, eventually I'm going to want to pivot back to the primary standard anyway. But thank you. Thank you. So I was just asking about the relationship between the different features of the secondary standard and one having to do with the periodicity and the other having to do with the way it's measured. Right. And I've given at least the start of an answer on the form. And I think my conclusion to that was just EPA found – EPA's own data shows there is a mismatch between the form. There are national parks that meet the primary standard while violating the weak cumulative form with the three-year averaging that EPA set itself. And these are parks like Grand Canyon National Park and Petrified Forest National Park. And EPA just said, well, we're just going to ignore those. And that's not reasoned judgment. That's just massaging rationale to fit a desired conclusion. But let me just put it more simply. If we were to say that EPA didn't justify using the three-year average because that allows unacceptably high annual levels of exposure, would that be a holding that we could arrive at separate from the W126 argument? Yes. Yes. And so for the averaging, the point is that CASAC said all of these studies are about single-year exposures to ozone. That's all the science is based on. And single-year exposures to ozone harm growing trees. And so the standard should be set at one year. And CASAC acknowledged that if EPA wanted to set it at a three-year average, it would need to reduce the level. And it suggested ways to reduce the level. It said, you know, you could figure out the ratio between a single-year high and the three-year average and figure out that average ratio and adjust the three-year standard by that or adjust the level by that. And EPA never responded to that. EPA just said, well, we'll just set it somewhat below what the single-year average was. And that's not a reasoned response to CASAC's recommendation. So that's arbitrary. Didn't they do more than that? I mean, didn't they also look at the Cottonwood data and say that it should really be excluded? And then based on that, they made the adjustment? Well, that's separate from making the adjustment between a one-year and a three-year. That's how EPA massaged the number that it arrived at so that it could be equal to – that's how they massaged the number so that it wouldn't be 15 part-per-million hours but rather 17 part-per-million hours. And EPA's exclusion of the Cottonwood data was also irrational. It said, well, CASAC said, this data, you're putting too much emphasis on it. CASAC also relied on the table that included the Cottonwood data. It relied on that and discussed it at length. And EPA's response was just to say, well, we're just going to throw it out entirely. And that's just not consistent with CASAC's advice either. It's not plausible to conclude that CASAC said, well, you're putting too much emphasis on it. We're going to rely on the data. I'm assuming that you want some time in rebuttal, although you didn't ask for any. But before you get to the end of your argument and ask for rebuttal time, would you deal with the grandfathering rule issue? I'm interested in your argument. I mean, doesn't EPA – hasn't EPA for a long time effective – set effective dates? And what's wrong with them doing so here? Well, EPA didn't set an effective date here. That's just not at issue, whether EPA could change the effective date. If that were at issue, we would still say it's illegal and arbitrary because it would be adjusting the effective date of a health protective standard on a non-health basis. Here, what EPA did is rely on what it calls implicit authority to create this waiver. It acknowledges that Section 7475A3 requires it to show – requires somebody trying to build a highly polluting factory or power plant to show that its emissions won't cause or contribute to air pollution in excess of any national ambient air quality standard. EPA agrees that this encompasses the new standards. Any national ambient air quality standards covers the new standards. And this course repeatedly held that any unambiguously means any under the Clean Air Act. It's true here too. I'm curious about the practical effect. So there are going to be some facility sources that would be – get a final committee decision before the new NAAQS come into effect. How are they then treated? Presumably they were functioning at a level that was acceptable previously, but if the – if it changes the area's PFC or, you know, then basically the contribution that the one facility is making to the overall ozone levels would then have to be accounted for by the area as a whole. What I'm asking is it seems like there's some distributional burden effect here that – and so every time you have a source, a major source, that's permitted and then there's some further regulatory stringency, is it the case that all – that all the emitters within that area then have to have, you know, special measures to reduce their ozone? Or would there be something focused on that one? Do you see my question? Because then if you're grandfathering, you're basically accepting – the area is accepting a burden that then is going to have to be the entire area. I think I understand your question. So if I understand it, it's – if a facility gets a permit before the new standard goes into effect, it's going to have this distributional effect – distributional issue. And if it doesn't, then it's going to have to make sure that it's not going to cause or contribute to air pollution. Right. Whereas if it's grandfathered, effectively knowing, anticipating that it is sure to have some effect that is not – that would not be acceptable under the new standard or isn't being required to establish its eligibility under the new standard, it's basically giving a path to one source that is then going to have to cause everybody to tighten their belts. Yeah, that's the problem. Congress drew the line. It said once there's a new standard in effect, all sources have to – all sources of a certain size have to demonstrate they won't cause or contribute to violations of the standard. And that in part was motivated by concerns about this distributional effect. Congress recognized that it would be more effective to prevent pollution before it occurs. I see I'm out of time. Good morning, Your Honor, and may it please the Court, Justin Heminger for Respondent EPA. My colleague Simi Bhatt and I are joined at council table by David Orlin and Melina Williams from EPA's Office of General Counsel. The revised ozone standards here represent notable forward progress in protecting the health of all Americans across this country. I'd like to remind the Court of what EPA did in this rule. In the revised standards, EPA lowered the level from 75 parts per billion to 70 parts per billion. And it did so – the Administrator did so to protect the health and welfare of at-risk populations, particularly children and asthmatics, across this country. How do you respond to your friend's argument that the study showed that under these new standards there would be hundreds of thousands of people adversely affected? Well, Judge Griffith, I think that's what I would – I would point to what Judge Wilkins was asking about. And the Administrator's explanation for that is on JA355 in the record. What the Administrator did was look at what real-world exposure to ozone does to humans. And certainly the clinical studies are one piece of evidence that the Administrator was looking at. Those studies showed that some individuals at 72 parts per billion ozone exposure while exercising or engaged in moderate physical activity would experience an adverse health effect – some individuals. But the Administrator then had to turn that into standards that protect the public health. Whitman says the public health is the health of the public. It's the health of people that are engaged in real lives and real activities on a day-to-day basis. And so what the Administrator did was develop an exposure assessment that analyzed how real people spend their time outdoors, what they do, what sort of activities they engage in, and when they would be likely to have an elevated breathing rate. And Judge Wilkins, I did want to make sure that it's not just that the air itself needs to be at a certain level. It's also that people have to be physically active. So your analogy of the boiler room, even an unhealthy level or these low levels of ozone, if you're sitting in the room, it actually has to be about 500 parts per billion before you would experience an adverse effect if you're just sitting in the room. So you actually have to be physically engaged, physically active to experience an adverse or a health effect at these low levels of ozone. What the Administrator was really doing here was not just protecting against 72 parts per billion or setting a standard that's protective at 70 parts per billion. When the Administrator set a level of 70 parts per billion, she found that that actually was very effective at protecting against a whole range of ozone exposures from 80 parts per billion all the way down to 60 as a way to protect the public health, or as Whitman said, what is requisite, sufficient, but not more than necessary. There are actually a couple of questions I'd be secondary to ask. Sure. There are two things that concern me, maybe you can clarify them. One is on the tree growth loss. I mean, CASIC was very specific in saying that if you're going to go to the three-year average, right, you're going to have to drop the parts, you're going to have to lower the parts per million, and EPA didn't do that. Went to the three-year average and didn't drop it. So what is the justification for going against the CASIC recommendation? Because whenever that happens, there's a special burden on the Administrator to explain what she's doing. There is, Judge Griffith, but I would push back a little bit on whether EPA actually responded to that advice. So the Administrator clearly considered that advice, and this was in response to Judge Pillar's question earlier about how the Administrator responded. I would put the Court to Joint Appendix JA403, Column 2. And there the Administrator attempted to wrestle with all these issues. So the Administrator recognized that CASIC had said adopt W126, Cumulative Seasonal Exposure Index, as the form of the standard. CASIC also said do a one-year average, not a three-year average. And then CASIC said if you choose to do a three-year average, then you have to set a standard that's lower than what you would set as a one-year standard. And I think that's the question. And that wasn't done. Yes. That part of the recommendation wasn't followed. Why? Well, I – how the Administrator – I disagree that the Administrator didn't respond to that advice, but how she responded was – She rejected that advice. How? Why? She took it by lowering the standard from protecting against 6% tree growth loss down to 5.3% And there is actually a delta there. So at 6% tree growth loss, the W126 parts per million hours is 19. If you look at the tree growth chart, then the next level down is 5.7% tree growth loss. And that corresponds to 18 parts per million hours. And what the Administrator did – and this is really where the Administrator is exercising her judgment – is she said, I'm going to go a little bit lower than that, down to 5.3% tree growth loss, and that was equivalent to 17 parts per million hours. So I – I can – Was it KSAC's recommendation to use 2% as a benchmark, not 6%? Your Honor, KSAC said look at 2% as a relevant benchmark, but it also said look at a range of W126 exposures between 7 and 15 parts per million. If you look at that range, the only number that would protect against 2% tree growth loss is actually 7 parts per million hours, W126. So even KSAC's own recommendation for range wasn't just consider numbers that would protect at 2% and lower. KSAC had a number of levels that they recommended that were within a range much higher than the 7 parts per million. KSAC's data all included the Cottonwood trees and the table that they produced included them, and I know there was some back and forth about the weighting of the Cottonwood data, but EPA, as I understand it, just excluded it, and how is that rational and adequately accounting for that data? Sure. Your Honor, so there's a small amount of comedy of errors here because, of course, the accusation is that KSAC provided the advice but wasn't really telling EPA to leave the Cottonwood data out, and then EPA just sort of said that's what KSAC was doing, but I think KSAC's advice was take the Cottonwood data out, and KSAC pointed to several scientific reasons for doing that, but EPA itself actually looked at the KSAC recommendation and then made its own independent judgment that the Cottonwood data should be eliminated for scientific reasons. Then just find the citation for the court here. Well, in any event, the reasons were, and this is in the rule, that the data for the 11 tree species that EPA ended up using actually was comprised of about 51 different studies, and those studies were controlled for climate and other factors, but the Cottonwood data, I believe it was one study, a single study, and it wasn't controlled for climate or environmental factors, so the data that EPA got from the Cottonwood study was actually much less reliable, EPA found. The other studies didn't include Cottonwood? No, Your Honor, it was 51 studies that covered the other 11 species, and then there was a single study, it may have been two studies that covered Cottonwood, but the Cottonwood studies did not control for climate, for environmental conditions. So you're saying that the 51 studies did not include Cottonwood? That's correct, Your Honor. Yes, so I think the total studies, there were 52 studies, but only one of those was for Cottonwood, and EPA, the administrator, listened to KSAC's advice on that unquestionably, but the administrator also made her own independent judgment that the science that supported the Cottonwood numbers was not as reliable as the data that supported the other 11 tree species that she ended up using for her tree growth analysis. Okay, the other concern I had is about the leaf injury, the decision not to measure for that. Explain that. Well, Your Honor, on leaf injury, the administrator acknowledged that ozone, there was sufficient evidence that ozone causes leaf damage, and that that had the potential to be adverse, but where the administrator paused was that the exposure response data, the criteria, the science, to show what levels of ozone would actually correspond to a certain amount of leaf injury is just not as developed as she felt she needed in order to reach a certain level of certainty to make a judgment about what level of... It was certain enough for KSAC, right? KSAC made a recommendation. It was enough for them. Certainty only gets you so far, right? It's not a totem that you can... Didn't KSAC find, I'm sorry. Didn't KSAC find that 10 parches per million hours was, you may use the word, required to protect against foliar injury? Yes, Your Honor. To Judge Griffith's question, EPA actually disagreed with KSAC's conclusion. Was it based on certainty or lack thereof? What was the basis for the disagreement? I thought you were making the point that the data was uncertain, so the administrator tread gently and decided not to impose standards on that. My point is, well, it was certain enough for KSAC to make the recommendation that Judge Wilkins referred to. It was, but then to... But EPA actually disagreed with KSAC's... So it's not uncertainty. I thought... The uncertainty is, Judge Griffith, the administrator is looking at the whole record of evidence that she has before her, and she judged that the evidence was uncertain enough that she couldn't determine what level of welfare protection would be... So is that the basis, one of the bases of her disagreement with KSAC? KSAC looks at it and says, there's enough here. We're certain enough that we can make a recommendation, and she looks at it and she says, I'm looking at the same data, and I don't think it's certain enough. Is that the dynamic here? Yes, Your Honor. Plus, EPA actually went out and did a separate analysis of the air quality data that she thought would have sort of illuminated KSAC's advice about the 10 parts per million hours. That's the Smith and Murphy memo, J.A. 394 to 395. And what EPA found from that memo is that, in fact, the trigger of loss did continue to correspond to, in some way, to ozone exposures above 10 parts per million. She didn't feel like that evidence was accurate enough to actually correspond the specific level of ozone exposure to a specific amount of leak damage, but it was enough for her to know that KSAC's sort of assumption, their presumption that 10 parts per million was what was necessary, requisite, was faulty. And so on that basis, she decided to disagree with KSAC's advice. But her overall judgment was simply that this evidence was not strong enough for her to make a clear judgment of adversity, whereas in contrast... You said in connection to tree growth loss, right? Oh, I'm sorry, Your Honor. Leaf damage, but actually... Because there is an issue here about whether she looked at leaf damage as an adverse effect in itself or whether it was a surrogate or something else, right? Well, that's actually the... I misspoke, but the tree growth loss was what the administrator found was the surrogate. She found that was a good surrogate for a broader range. But what I'm getting at is, how about leaf damage in itself, as an end in itself, something to be avoided? So the administrator considered that. She, in fact, looked at three different types of vegetation effects. It was the tree growth loss, it was the leaf damage, and then crop yields. She looked at three different types of effects, and she looked at each of them and she found that leaf damage was one where she had a lot of really good data that she could draw a judgment on what was requisite to protect public welfare. And, in fact, for leaf damage, she... You mean tree growth loss. Tree growth loss. Thank you, Judge. For tree growth loss, she found that that was a good surrogate or proxy for a broader range of effects. But for both leaf damage and crop yield loss, she found that neither of those gave her enough certainty in the evidence to make a judgment. Help me make sure that I'm understanding the statute correctly and how the administrator is supposed to do this. So the finding that's required is a finding about what's requisite to protect the public welfare, right? That's correct. And if there are different levels that would be required to protect tree growth loss versus crop yield loss versus leaf injury, is the administrator required to just pick the lowest, the most protective? Let's say it's 20 parts per million hours for one and 10 for another and five for the third. To protect the public welfare, is the administrator required to pick five because that's the most protective? Or how does the administrator weigh the fact that different levels are required to protect those different indicators of the public welfare? Well, it's a very good question. I think it's a tricky question because, on the one hand, the administrator has to look at all the effects that are occurring that may be potentially adverse. And then she has to make judgments about which effects would be adverse to the public welfare. And then she has to set a standard. Congress has given the administrator a certain amount of judgment, and some of that's scientific judgment and some of that's policy judgment. So I think it's difficult to say that the administrator would have to pick a certain level if one effect was at the lowest level. But certainly the administrator would have to account for that in her decision. I think that's a question that maybe we all share. It's known and demonstrated scientifically that there's leaf damage from ozone exposure. And KFAC made a particular recommendation, 10 parts per million hours. It said that it was a bright line, but that was its recommendation. And it seemed like EPA just said, well, you know, there's some uncertainty here. Let's treat tree growth as a surrogate for leaf injury. I'm not aware of scientific evidence explaining the relationship between the tree growth problem and the leaf injury problem that supports the surrogate determination. It feels like maybe a response to the quite difficult question that Judge Wilkins raised, which is, you know, you have various data that show different levels of tolerance and how should the administrator, you know, come up with a public welfare standard. But I just don't see where EPA has grappled with that. You know, given the damage, given the determination that this is an important element of the public welfare, it reads as if it's dropped off the table. Well, Your Honor, I would like to clarify that the administrator did not find that tree growth loss was a good surrogate for leaf damage. So I think the record does reflect that the administrator found that tree growth loss was a really good surrogate or proxy for a broad array of vegetation effects. But the administrator didn't find that tree growth loss was a direct surrogate or somehow directly accounted for for leaf damage. So she didn't find that. What she did find was that she had really good information, scientific criteria, to use tree growth loss as a basis for protecting against a number of vegetation effects. Now, of course, leaves are part of trees. But, again, the science isn't there for her to correlate the tree growth loss to the leaf damage. The science also isn't there, the administrator found, to actually quantify leaf damage as a separate vegetation effect. And that's where she made the judgment that she couldn't set a standard that way. Why not? I mean, there's science on that, and there's some uncertainty in every standard setting, as we've seen on all the issues in this case. Isn't it incumbent on the administrator to figure out some standard? Well, the administrator did set a standard that she judged. Related to leaf damage. I don't think 7409B2, the standard setting provision here, requires the administrator to set separate standards for each vegetation effect. As long as she is bound and judged that she's providing requisite protection for the public welfare. Well, like in the American Farm Bureau, we said that EPA's assertion that it need not determine what level of visibility protection is requisite to protect the public health fails under the guidelines of the statute. It seems like, similarly, there needs to be some level set that's requisite to protect the public welfare, some level of leaf damage. No? I disagree that if the science doesn't allow the administrator to make that judgment, I think that's where you enter a realm of uncertainty. At the same time, the administrator did judge that lowering the standard here, the secondary standard, would provide some level of protection for leaf damage. But she wasn't certain how much, because the studies, and they're referred to as exposure response studies, that's what she had for the tree growth loss. She didn't have that sort of data for leaf damage, so she couldn't correlate those studies. I guess the secondary standard, neither standard is easy, but to understand the administrative rationale, I guess I wouldn't recommend that the court read the entire rule, but at JA 402 to 409, that lays out the administrator's reasoning for how she got from case X advice and considered each of these vegetation effects, tree growth loss, leaf damage, crop yield loss, and then ultimately judged that a standard based on tree growth loss would be requisite to protect the public welfare. What is the source of EPA's grandfathering authority? Where does that come from? Well, Judge Griffith, we would say that the source of authority is in the prevention of significant deterioration provision that's at issue. We would say that the tension between the two requirements, that the permitting applicants submit a permit, and then in 7475C, that the permitting authority grant or deny a completed permit within one year, that the tension there creates an ambiguity, authority. Why is there a tension? You didn't make it, you have to resubmit, you fail. I mean, the statute talks about the application is made and it's either accepted or denied. So you deny the application because you're not compliant with the new standards. So I think that there's a tension about that. Well, Judge Griffith, there's a tiny thing here because there are actually three steps. The administrator, excuse me, the permitting authority, let me back up, the permitting applicant submits the application. Then under 7475C, the permitting authority, and that's either EPA or the state, actually has to make a decision that the permitting application is complete. Or in some instances, some states will simply sort of publish the proposed permit, which is the equivalent of finding it to be complete. Then that, under 7475C, triggers the permitting authority's obligation to grant or deny within one year. So it's a three-step process. And what we're talking about is permits that fall in that third bucket. So grant or deny within one year. Right. You deny. You haven't met the max, you haven't demonstrated the capacity to meet the max, and so it's denied. What's wrong with that? Well, Judge Griffith, think about two permit applicants. One is, you know, sort of submits their application and it's found to be complete. And, you know, within a few days, the permitting authority grants the permit. Another applicant, their permit application is pending, and then for a few more days, and then the new max comes out. And then under the environmental officer's reading, the difference there is that now the permitting authority has to simply deny. EPA took a middle ground here by saying that a permitting authority could find that that permit. I understand they took a middle ground. The question is on what authority did they take a middle ground. Well. Let me ask you this. What are the limits to the EPA's grandfathering rule? I mean, could they say, you know, three years after the new max become taken into effect, we'll give you three years until the effective date? I don't understand. No. 7475C says within one year. So the most you can give them is an extra year to comply? Yes. But the one year is just when the agency has to act on it. That's correct. I don't understand how that supports grandfathering. Because, I mean, you could have done something that seems more consistent with the requirement that a source meet any max, including the current ones, which might be to, you know, treat a – I don't know, the various ways you could help with resubmission or with tweaking of the proposal without grandfathering. So the concern is the same concern that my questions to environmental petitioners expressed, which is wouldn't it be the case if a source is permitted that – and it either under the new standard the area is, you know, may stay in attainment but exceed a PSD increment, that the downstream administrative burdens and compliance burdens of the new increment are going to be imposed on all sources in the area? The state is going to have to scramble in a way that when we know the change is coming into effect, why would we invite that, you know, that challenge, that emitter into an area when it's going to have that kind of effect? So I agree that there is then a process through which the state will have to figure out how to account for the new source and whether – and if it's applying the 2008 max rather than the 2015 max, then there may be some difference there. And that does put a burden on the state then to account for those sources. And on other sources. That's correct, Your Honor. And that's certainly part of the problem here that EPA had to wrestle with. And to Judge Griffith's point about authority, we also did point out that we, under Citizens to Save Spencer County, that this court had noted that EPA has authority under 7601, sort of general rulemaking authority. Now EPA in this rule has primarily invoked its authority to interpret the tension that it saw between the Subprovision A and Subprovision C, but it also did invoke in sight to its general authority set necessary regulations. Okay. We'll hear from industry respondents and viewers now. Thank you, Mr. Hill. Good morning. Good morning. If the court please, my name is James Beeky. I represent the industry. Mr. Johnson's main argument on the primary standard was that EPA found that 72 parts per million ozone causes adverse effects, but it set a standard which would allow numerous individuals to experience exposures at 72 parts per million or above that could cause adverse effects, and that's unlawful. But that's too simplistic. As both the legislative history and this court's prior opinions have held, there is no requirement to set a standard that prevents all occurrences of levels that could cause effects that are considered by the American Thoracic Society to be a definition of adverse or indeed to prevent all such effects themselves. The administrator's task was to decide whether overall ozone effects have an adverse effect on the overall public health and to set a standard that is requisite to protect the public health with a medical margin of safety. That means it has to consider the nature and severity of the effect, the frequency of exposures that could produce effects, the frequency of effects, the uncertainties in the evidence, and make a judgment. But, Mr. Beeky, where it is established by the evidence that a body of exposures will most likely occur, it's reasonable to anticipate they will occur, and that they will cause harm. That does seem to be... Well, you have to consider, I think, the nature and severity of the effects. In this case, you had earlier asked, do people experience effects like T's? Is there a cumulative effect? It's not. Effects that are shown at 72 parts per million are transient effects that are reversible. They're small. They're a small percentage of subjects. They're a greater than 10% decrement in one function. Some of those subjects had symptoms only after exposures during exercise, after six-hour exposure to exercise. Given that nature and severity of effects, it was reasonable to consider the frequency. EPA stated that the judgment as to the adversity of effects to the public welfare, I mean to the public health, the overall public health, depends and is influenced by the frequency at which these effects would occur. And so, it was reasonable for EPA to consider frequency of the effects, frequency of the exposures, and make a policy judgment as to the level at which ozone effects address to the overall public health. And that was a policy judgment. It was explained and should be upheld. Now, the court, please, just one second. This court recently required trade associations, which are my clients, to identify, seeking or claiming representational standing to identify individual members with individual standing. And I just want to note that Murray Energy, who is also a petitioner but has individual standing, is a member of my client, National Association of Manufacturers, so that's an individual. And we can submit a document to that effect or that effect does it. Okay, thank you very much. Thanks for the additional time. This court's case law says standards, primary standards, must ensure the absence of adverse effects on sensitive populations. We're not talking about risks here. We're talking about acknowledged adverse effects that 66% of healthy young adults exposed in the lab experience. And even if not everyone is going to experience them, a senior with asthma who experiences lung function decrement and respiratory symptoms could go to the hospital and could suffer very, very severe adverse effects. What EPA is doing here is saying that when areas have ozone levels at or above 72 parts per billion, the air is unhealthy for sensitive groups. Sensitive groups should stay inside. But EPA is allowing these areas to have these harmful levels of ozone repeatedly and not have to clean up the air. Is that not quite fair when the exposure studies look at ordinary activity, not a cautionary you must stay inside activity? I mean, it's ordinary activity for an outdoor worker who may have no option but to go outside on a day like that where that's the person's job. It's a simulation of what an active child will do on a summer day. And allowing those harmful exposures to continue without areas having to clean up the air isn't consistent with the Clean Air Act. That's why EPA itself made clear that it can't rely on the intersection of people with harmful air to write off the harmful levels of ozone. That's at JAA 2132. And at the very least, EPA hasn't shown or explained why the exposures that it does allow aren't harmful to public health, just like it failed to do in the American Lung Association case. If anything, this case is more irrational than American Lung Association because there, EPA disputed whether the pollution at issue caused adverse effects. Here, EPA agreed that the pollution at issue causes adverse effects. I didn't get a chance to talk about leaf damage before. Just Mr. Heminger said that CASAC referred to 10 as a threshold, 10 part per million hours. CASAC at JAA 515 didn't say that it wasn't a threshold, said it was a place where the rate of change and the number of sites with leaf damage changed. And it's not just CASAC who gave EPA advice about what levels would be requisite. It was also the National Park Service. EPA has just pointed to uncertainty here, and Farm Bureau makes clear that just rote incantation of uncertainty doesn't carry its burden. If I can just say one very quick note about grandfathering. This case isn't at all like Spencer County. In Spencer County, there was an insuperable conflict between two statutory provisions. There's no actual conflict. There's just a reference to attention. EPA doesn't like the policy that Congress established. EPA has no authority, implicit or anywhere else, to override that policy. What was the citation you gave on the leaf damage? JAA 515. 515? Yeah. Thank you. Thanks. Thank you very much. So we're now here for Mr. J. Is that right? You want to do the background, Ozone? Do you all need to switch places now? Okay, we'll give you a minute to switch places. We'll keep our places. Sorry about that. Good morning. Good morning. May it please the Court, I'm Dominic Dre, and I represent the state petitioners. I will endeavor to reserve four minutes of time for rebuttal. Our case is about the requirement of a reasoned rulemaking process, and here that process was deficient in four ways. First, EPA's focus on mean or average contributions of background ozone rather than peak contributions. Second, their distinction between interstate and international contributions to a state's uncontrollable ozone. Third, the consideration of background ozone when selecting a value from within a range, but not when selecting that range itself. And finally, their insistence that background ozone alone must constitute an exceedance in order for there to be a cognizable problem. To walk through those, first the peak versus mean question. We recall the peak-peak issue in our briefing. EPA discusses seasonal averages for background ozone in its models. It says that the seasonal means contribute 25 to 50 parts per billion. The problem, of course, and why this is arbitrary, is that your seasonal mean isn't what triggers nonattainment. It's your fourth worst eight-hour reading. In the same way, when EPA pivots to talking about high ozone days, ozone days with 70 parts per billion or more, they average over the entire U.S. And in so doing, they conclude that 35% of background ozone on those days is, excuse me, 35% of the total observed ozone on those days is background. But once again, nonattainment doesn't depend on the average over the entire country. It depends on the site-specific data. They do in the policy assessment actually give a glimpse into what it might look like if they had done this rationally. Figure 40 is at 786 in the Joint Appendix. It shows location-specific modeling for background on high background days. And there you have many locations, especially near Mountain West and the upper Midwest, which largely tracks the composition of our petitioner coalition, where background ozone contributes 70 or 80%. And that, again, is still deficient in some ways because it is still a seasonal average in those locations. But nevertheless, it is at least location-specific on high ozone days. Secondly, we discussed the contribution of interstate versus international ozone. As Justice Ginsburg explained sort of humorously in the EME Homer City case, air pollution is heedless of state lines. We know that, and EPA knows it too. We know that EPA concedes that point when it talks about international ozone as being something that they should consider but not interstate. EPA actually has a definition for the kind of background ozone that we're talking about. They call it the generic definition, and they discuss it a couple times. JA 651 in the policy assessment, they describe ozone that cannot be influenced by the actions within the jurisdiction of concern. The same thing, note 84 in the final rule. They talk about ozone that comes from outside the jurisdiction of an area. But then in the very same footnote, they, quote, assumed, not my word, theirs, that when commenters spoke about background ozone, they were talking about U.S. background, which is to say background ozone that's not generated in the United States. But that's an arbitrary distinction, and, in fact, if anything, it makes very little sense, and it underscores the arbitrariness of this, for EPA to seize upon international ozone as being uncontrollable but not interstate, because, after all, at least international ozone has one of these enforcement stages. Can we start with the statute here? Sure. What in the statute requires EPA to take into account background ozone when establishing maps? Is there anything in the statute that requires that? Yes, Your Honor. And it starts in Section 109, exactly the section that EPA reads nearly in total isolation. That section refers to public health. It talks about what's requisite, and it discusses the judgment of the administrator. You probably know where I'm headed with this. There are at least three provisions in the statute that talk about EPA taking into account background ozone in the implementation of the NAAQS, which suggests that that's where you pay attention to background ozone, that it's not necessary to do so when you're establishing the NAAQS in the first instance. So a couple of responses, Judge Griffith. First, I actually read those enforcement stage measures the opposite. I think they're evidence that states are not supposed to be on the hook for ozone that they can't control. That's why it's carved out. The second response is the requirement of a reasoned exercise of judgment. I mean, judgment appears all over the statute, including in 109. That goes to how you arbitrarily distinguish between kinds of background and measurement metrics, like we were talking about in this petition. There's also, of course, the requirement in 107A that states achieve and maintain the standard, which assumes that it's achievable and maintainable. The same thing appears in 110, the SIP provision that requires them to submit SIPs that will accomplish this. Running through all of this is the assumption that they will be achievable standards. And actually, you know, the reliance, we pointed out in the 20HA, flurry of 20HAs over the weekend, that this court has already said that you can't rely on later stage relief safety valves, was the court's term, in order to solve a rulemaking that was arbitrary, which gets back to these process errors that are really the thrust of the state's petition in this case. To continue marching through them, the range versus value choice. EPA says that it could not consider proximity to background ozone. This is a quote I should note. At 638HA, 638, EPA did not consider proximity to background ozone concentrations when identifying the range of policy options. Then at 65.328, the big background page of the rulemaking, the agency says it may consider them only when selecting from within this range. The thing is that this range value distinction is nowhere in the statute at all. That's totally a creation of agency practice. Well, I think the logic is that anywhere within the range is requisite. The agency is not considering background ozone as an excuse not to come up with a level requisite for the public health, but when it has some leeway in determining against the background of the science what's requisite for the public health, it may take into account the background. I agree that that's a summary of EPA's position in this case, and it has a sort of superficial appeal except that the question is then why are they allowed to consider it when choosing within that range? The idea is that the dominant goal of the statute, the requirement of the statute, is to set levels that protect the public health. If it's really impractical, the agency is not allowed to say, well, okay, let's harm a bunch of people because it would be really hard to move forward without allowing a lot more ozone, and Congress seems to have said, no, actually, we're not going to do that. It may be a scramble. It may mean no development here. It may be very difficult, but public health, I mean, if you can't live in the air, that's the bottom line. And so if that's the objective and there are multiple ways to meet it, it does seem like it would be consistent with the statute to say at the implementation stage, well, if there were some ways to meet this that are fairer, you're going to take that into account. So I think there are a couple of responses there, but let me begin by disputing the premise that EPA certainly advances, that the Clean Air Act has a sort of singular focus on declaring a standard, come hell or high water, that is as protective as possible. We know that that's not true. That's not what I said either, though. I said requisite to protect the public health. And obviously if it were as protective as possible, there would be no range. That's right. Unless there's some plateau of health effects between the two poles of the range. But where there is a discernible, real, scientifically supported health effect, the idea is that whether it's caused by background ozone in part is not going to be the basis for a discount. I mean, if you look at that, that wouldn't really make sense, would it? If there's a lot of background ozone, we'll just act as if that's not there, because it wouldn't really be fair to permit applicants. Let's imagine it's a level ozone field and allow permits up to some further increment. It wouldn't make sense. Your Honor indicates correctly that there is obviously something doing some work to put the brakes on, because as this Court and the Supreme Court have recognized, ozone is a zero-threshold pollutant. At some level, it will have some effect on some person under some circumstance. So there's some degree, somewhere in the equation, that they're applying the brakes. And that has to be gleaned from the remainder of the statute. What are those limiting principles? That's actually exactly what the government just argued a couple months ago to the Supreme Court in the Gundy case, the non-delegation case on which the Court just granted cert this last term. And the answer is, you look around in the statute and see what the limiting principles are. So maybe it's requisite that's doing the work. That was the answer in Whitman. Maybe it's a technical understanding of the term public health, which we identify in our briefing using the contemporary public health dictionaries, that that includes some concern for other things like the ability to make a living, which is the gist of Justice Breyer's concurrence in the Whitman case, that the industrialized society is not a very healthy society. But whatever it is, the agency is applying some principle, or at least we assume that they are applying some principle, to try and apply the brakes on the zero-threshold pollutant. And our complaint, the reason that we're here with this petition, is to ask that that standard be applied in a rational way. Hasn't your argument already been rejected in API? No, Your Honor. API is one of a series of cases, beginning with lead industries, in which this court and the Supreme Court have said that cost, economic cost, can't be considered. And so in API, that was exactly API's argument, the Petroleum Institute's argument. The city of Houston also showed up and used language that sort of sounds similar to what we're talking about. Yeah, sure, as they use the word attainability. Attainability, yeah. Sounds very similar. We use the statutory achievable, but they are using a similar term. And we know that that's not the same thing, though, because if you look into their briefing, what they're talking about is that it would be hard to do. And we're not arguing that it would be hard to do. We're arguing that this was a misconstruction of the statute. Furthermore, Houston was complaining. And what did we say to their argument that it would be hard to do? You said that that was not an acceptable consideration. How is your argument different? First of all, Houston is not a state, so it doesn't have even the standing, I think, to assert what we're asserting now. But secondarily, at a more practical level, the background in that case was about 60 parts per billion in Houston. And they were complaining about a standard set of 120 parts per billion, so a standard, in other words, that left a full 60 parts per billion for human activity. That's in their briefing. They granted all that. But that is essentially a concession that they were not close to background. They were not getting into the area that we're talking about preserving some margin for human activity. It's a factual distinction, but it has incredible legal consequences. And in our case, Mr. Heath. I remember one of the 28-day letters said, you know, you anticipated that there would be many, many, many areas that would be at maximum, and they said now we know that it's not. So, I mean, how big of a problem, how close to crisis is the record at this point? Yes, well, so we will wander outside the record here. But we know that in Arizona, for example, we have another area. We went from having Maricopa County, now Yuma is also designated, and this is hot off the presses. Pima County just tripped it as well. So we've tripled our number of non-attainment areas in the state of Arizona. I don't know from my coalition partners what it looks like in their state, but I can give it to you. And what happens at non-attainment? I mean, this is also relevant to the. Right, so the first project, you know, once an area becomes marginal non-attainment, obviously we're working on the SIFs now. The permitting process takes effect immediately for new sources that requires, in the first bid, marginal non-attainment, a 10% offset for certain emissions. And then, of course, these ramp up from there. And with the anti-backsliding provisions and everything with which the court is familiar, it takes 20 years of compliance to get back out of these circumstances. And so you have places like Yuma, for example, which is not a very developed, not a heavy industrial part of our country. It's a poorer area. It has an overwhelmingly minority population. And that area is now facing these limitations because, among other things, so they have a design value of 71. Sixteen parts per billion blow in from California. That's a JA 2021. So you have real costs for people in a poor area that could benefit from some growth that are being imposed because they have the misfortune of living downwind from outside of the jurisdiction that we can't control. To your question, though, as a legal matter, Judge Pillow, EPA itself grants that, quote, a non-de minimis number of locations where background exceeds 75, that's a JA 120. And then in the final rulemaking, they talk about many instances. Their term, I don't know how many is many, but, frankly, even if it's one, it's a problem. Many instances with background over 70 parts per billion due to out-of-state contributions, and they specifically discuss California, that's at note 230 in the final rulemaking. Which gets to the final and fourth way in which this process was arbitrary and capricious. That is insistence on background alone as the cause of an exceedance. This court has explained in American Trucking 3, it used the language too close to peak background levels. And we know from the policy assessment, JA 773, EPA recognizes that zero man-made emissions is an unrealizable scenario. All of this recognizes what we know to be true, which is that there's supposed to be some margin for human activity. That was also, again, Justice Breyer in Whitman. So the claim from EPA off-repeated that there will only be 22 exceedances under their model, 22 exceedances of 70 parts per billion, that's looking at exceedances with background ozone alone. And, again, it's their sort of tailored definition of background ozone, and it involves a model with average. So these things kind of compound each other. But even taking that out of its face value, that's 22 exceedances of 70 based on background alone that allows no room for human activity, which this court and the Supreme Court have indicated is a misreading of the statute. Isn't it no room for human activity without a lot of compensating measures? No. Is that what they're saying? I do not think that is what they're saying. As I understand this model, the prediction here is 22 exceedances of 70 parts per billion based on USB alone. Right. But I'm saying, and you say, and therefore no activity, no new permits in that. And I was just saying, yes, new permits, but under more on-Earth conditions. Oh, no. So these exceedances that exceed 70 based on USB alone would involve zero human emissions. So it's true that if you were to have emissions there, it would be heavily burdened. Is that your honest question? If you wanted to, then you can't bring any new development. Correct. Will you be in whatever nonattainment that area is in? So that would depend on the particular area we're talking about. It would be more costly. That's exactly right. But more to the point, that area would have been arbitrarily classified as being a nonattainment area when we know that the Clean Air Act is supposed to allow some margin for human activity. So with that, I will reserve the balance and thank the court. Thank you. Clerk, please. General Dre has argued that EPA, the Act requires EPA to consider background. EPA will argue that you don't have to reach the question whether the Act requires or allows EPA to consider background because in this case, EPA found as a factual matter that background levels didn't provide attainment. I want to offer a couple of other possible approaches you could think about. One is based on the following three factors. One, I think it's clear that reading the Act to allow consideration, regardless of whether it requires consideration, to allow consideration of background would be a permissible reading of the Act. That's what the court held in American Trucking 3, that you could consider it. Second, we've shown that EPA has recently recognized in one of the 28-J letters, some recent events have shown that they recognize that it's an important aspect of the problem. The impact of background levels on attainability of the standard is an important aspect of the problem. EPA tried to address that by saying that background levels won't provide attainment. But that was based on the assumption, as General Dre said, that we're talking about background levels alone. So they never really grappled with the fact as to there must be some allowance for human-caused activities. How big it is is not a matter that EPA didn't have to address because they didn't address that issue. So I think all those things together show that EPA did not take into account an important aspect of the problem, which is a hallmark under the APA of arbitrary decision-making, and the case could be remanded on that ground. I have one other one, a possibility. That is, since EPA didn't really come to grips with the question of whether background levels would prevent attainment, once you take into account the sum allowance for anthropogenic activities, they also then didn't have to really come to grips with the problem as to whether the Act allows them to do that. And I'm suggesting that another possible approach is that this Court could remand the case to EPA to consider these things in the first instance before the... Give EPA a shot at addressing... If they fix those things, they can address whether consideration of background is permissible when you take into account that there has to be some allowance for human activities. And EPA should consider that first and then before the Court has to rule. So those are some suggestions as to possible activities I'd like to reserve however few seconds I have. Thanks. Absolutely, thank you. Good morning. Good morning, Your Honors. May it please the Court. Simi Lott for the United States EPA. Your Honors, the Clean Air Act does not require EPA to raise an act because of background solution. What the Clean Air Act requires is that EPA set an act that is requisite to protect public health and welfare. And the nation's public health and welfare is at issue in this case. State and industry petitioners' argument would deny necessary protection to millions of Americans across the country when the record shows that only a few areas may experience high background ozone events. If background ozone blowing in from overseas caused exceedances in all or most of the western United States, would the Clean Air Act require those states to somehow suck the ozone out of the air? Your Honor, EPA has never said that, and that is far from the situation here. Of course, under the International Transport Provision, states, yes, their areas will be designated non-attainment, but the data from that international pollution can be excluded, and so states will not need to demonstrate that they actually attain the NAAQS. They'll need to demonstrate that the international pollution is the but-for cause of their non-attainment. So, no, under the NAAQS. And then what implications for industry? And then what implications for industry? Well, the areas would maintain their non-attainment designations, so industry would still need to abide by the non-attainment resource review rules, et cetera. But the states would not be sanctioned. There's no implication of that here. In terms of the number of areas that are at issue, EPA studied locations across the country throughout the ozone season. There are more than 275,000 data points accounted for in EPA's models. And what EPA found was that only 2 or 22, depending on the model, points would exceed 70 ppb. And in terms of 60 ppb, only 35 or 135, again, depending on the model, would exclude 60 ppb. So we're talking about very few areas. Keep in mind there are over 3,000 counties in the country, and state petitioners have discussed three. And what are your responses to Mr. Gray's general days and Mr. Beeky's arguments about the averaging and how the data that you're relying on is just not realistic about how areas go into non-attainment? Your Honor, the points that I just discussed, the 2 and 22, 35, 135, those are days. Those are not averages. Yes, EPA also studied the averages, but EPA studied these points as well. So it's incorrect to say that EPA only studied the averages. As to Judge Griffith's question about API, the facts are different here, but the analysis still holds. We're talking about, again, limited areas, mostly in the Intermountain West,  and just like in that case, these regional implementation concerns do not need to change the level of the NAC. Can you point to, mainly in support of that, the various authorities, exceptional events, international transport, and the rural transport provisions? What about exceedances that might be caused or substantially prompted by background ozone that don't fit into those categories? What recourse? Your Honor, what EPA found on this record is that the levels of background ozone over 60 dBV, those that would approach or exceed the NAC, those are associated with stratospheric intrusions and wildfires. And those events do fall within the exceptional events provision. So we're not talking about standard biogenic emissions that push background ozone way into those outlier categories. Those more typical background emissions are accounted for in the seasonal mean, obviously, with some variation. Could I ask you to respond to Mr. Dre's statutory argument, which I said doesn't the statute read as if these exceptions in the implementation suggests that there is no requirement to consider background ozone in the setting of the NACs? You heard his argument in response. Could you reply to that? Yes, Your Honor. Mr. Dre is pointing to some provisions that reference state implementation plans. And the conclusion that he's drawing from that is that under those provisions, states are required to attain the NACs. That is not true. State implementation plans are submitted after exceptional events demonstrations. So the states will not need to demonstrate attainment, you know, in terms of extracting background ozone, because that background ozone data will have already been eliminated from the levels that the states will need to address. Also, Your Honor, in terms of the statutory argument, those provisions show that Congress was aware of background pollution, and as you said, Your Honor, rightly so, did not require EPA to account for background pollution in the setting of the NACs. Does EPA have a position on whether it's permitted to consider background ozone in setting the NACs? Your Honor, we believe that that question was not squarely addressed by this record. State and industry petitioners argue that EPA must raise the NACs, not that EPA could do so. And so we would say that that question is prudentially unright before this Court. EPA will be undertaking another NACs review, is currently undertaking another NACs review, and will be looking at that question. And at that time, we believe it would be the appropriate time if EPA does make a decision on that, to review that question. And for support for our prudential ripeness proposition, I would direct you to the case API v. EPA. It's actually one of Judge Griffith's cases. It's that 683S3-382. Your Honor, it's on the interstate emissions point. EPA rightly excluded interstate emissions from the definition of U.S. background, which is what EPA studied, because interstate emissions are controlled for under the Clean Air Act. Through the neighbor provision, yes, but also through the petition process in Section 7426A, as well as the transport region process in Section 7506A, parentheses A. Why the distinction between U.S. background and international background? Well, U.S. background excludes international background, and also it excludes natural background. So there are those two components that are excluded from U.S. background. I was just saying why. Does that make sense, if you're looking at it either from a health perspective or from an industry challenges and state challenges perspective? It makes sense from a modeling perspective. There are different modeling inputs or boundary conditions that you use. And so the source apportionment model, which is one of the two types of models, allows you to trace back to natural or international. Your Honors, in the flurry of 28 J letters, one of the letters, I believe it was a state petitioner's letter, cited a FERC case, and I just wanted to make the point that this case is not like the FERC case, because in that case, the agency had created an exception when the statute charged it with creating a general methodology. Here, EPA has not created these exceptions. Congress has created these exceptions. Moreover, in the FERC case, the exceptions were so numerous, the court was concerned that they might swallow the rule itself. And here again, as we said, the outliers are extremely rare. If there are no further questions, we ask the court to deny the petitions and to reserve the question of whether EPA may ever consider background pollution in a future act. Thank you. Mr. Johnson. Good morning again. Seth Johnson for Health and Environmental Intervenors. The question of whether EPA can consider background pollution at all is a straightforward legal question that has already been answered. It's a Chevron step one question. This court should reach it, and under this court's precedent and the Supreme Court precedent, it's already been rejected. EPA has no authority whatsoever to consider background ozone in setting standards. The base petitioners here are claiming that Congress surreptitiously made attainability a relevant consideration in standard setting by requiring plans to create – excuse me, by requiring states to create plans to achieve standards. That's an ancillary provision to the standard setting provision, and the Supreme Court has already explained that for Congress to change what the fundamental basis for setting standards is in some provision, for Congress to change that fundamental basis for setting standards. That's not an issue we need to reach in this case, though you'd like us to. It would be efficient. Efficient. And it would be proper. And this – well, Whitman already held that the only thing that's relevant is the health and welfare effects of the pollutant in the ambient air. This court has already held that repeatedly. And as a result, petitioners' arguments about background ozone and attainability, whether styled as attainability or achievability, fail. API v. Kostal is directly on point. In that case, this court reviewed challenges to ozone standards. Industry and governmental entities, some of which are parties today, argued that background ozone and the attainability of standards were important considerations in standard setting. And in that case, the court easily rejected the argument. API controls here. They try to evade it. They say API didn't address a situation where purportedly broad swaths of the country wouldn't be able to attain the standards or would find it really hard to attain the standards. And that's simply wrong.  The issue of whether attainment of the proposed standards would be precluded in most areas of the nation by natural background levels of ozone was irrelevant to standards setting. State petitioners ignore this point entirely, though it's controlling case law. And industry petitioners make the irrelevant point that the court simply referred to its earlier conclusion on attainability. The fact that API repeatedly held that attainability was irrelevant hardly weakens the force that it's holding that attainability is irrelevant, even when someone claims that a standard's attainability is broadly questionable. They also rely on APA 3. APA 3 never once recited API. The discussion of background ozone is at most a subsidiary issue there. And even industry petitioners agree in their reply at page 10 that the question of whether EPA could consider background ozone wasn't squarely at issue in that case. So it's dictum. And even if there were some conflicts between APA 3 and API, API would control because it's the older case. Thank you. Good morning, Your Honors. Jonathan Weiner for State Interveners. I'd like to make two points. First, as Judge Griffith was alluding to with your initial question, Congress has already spoken to the question of how to handle background or the effects background emissions might have on attainment. You mentioned three provisions. I count at least five scenarios covered by multiple provisions in the Clean Air Act. Math is not my forte, I guess. Well, I'm not giving you an exact number. I'm saying it's more than five. But it covers interstate transport, international transport, rural transport, exceptional events. And I'd like to point out one other example that was not cited in the briefs that I think gets to Judge Pillard's question about what doesn't fit. And that is Section 7513E and F, which addresses biogenic emissions of particulate matter and provides for waivers and extensions of certain non-attainment requirements. It's for particulate matter, not ozone. But taken together with all the other provisions, it shows that Congress thought about all of the concerns that petitioners are raising and articulated in specificity how and when each of them should be addressed. And there would have been no need to have done this if EPA could instead respond to background emissions by simply weakening national standards below the level requisite to protect public health. Judge Griffith, you asked if the Court needs to reach this question. I think you may need to reach this question if, depending on what you think of the petitioner's argument, that EPA has wrongly concluded that it cannot consider background ozone. The second point is about the point of the NAAQS program. And that is to identify areas with unhealthy air quality and help them improve it. Non-attainment designations are a feature of that program. They're not a bug. And in the experience of our coalition of states and state air agencies and the District of Columbia, their non-attainment designations are very helpful to us in improving our air quality. Just a number of ways in which they do that, they unlock several tools. Most importantly for what we're talking about today, I think the provisions that give downwind states recourse against emissions from upwind sources. They unlock federal grant funding. They trigger planning processes. In some cases, they allow greater action under state law. And they inform state and local decisions about resource allocation and where it's safe to site industrial facilities. If EPA did not have to call a spade a spade but could instead pretend unhealthy air protects public health, we would lose all of these benefits. And just to respond to State Petitioner's argument about the effects of California emissions on Yuma, what they're really arguing is that the NAAQS should be weaker nationwide, which would result in California no longer being responsible for emissions that it might be sending into Yuma. It would also result in states in the northeast losing the benefits of non-attainment designations that have nothing to do with emissions that might be traveling back and forth between California and Yuma, or as I imagine you would say, in just one direction. And that's where Petitioner's interpretation leads. It's wholly irrational. It's not what the statute allows. And as the co-counsel just said, it's already been decided by within an API. We ask this court to reject it. Thank you. Thank you. How much time does Mr. Dre have? Is that enough? You want three? How much time do you have? Two and a half minutes. I've only got about a minute. It's been a long morning, so I'll try to be efficient about this. A couple of points in response to my various friends on the other side. First of all, EPA points out that we've discussed only three counties. There are only 15 counties in Arizona. Out west, they're pretty big, and it covers huge swaths of land. They also said that the reason for distinguishing between international and interstate was modeling. That is not a sufficient rational explanation for that distinction. I'll also take the opportunity to discuss briefly the claim that the consideration only as to the range might not be right. Only isn't my word. It's in the rulemaking. At 65-328, they just graphed that word on to American Trucking 3, which says that you can consider it. On the subject of American Trucking 3, Mr. Johnson pointed out that under his reading, that's somehow at odds with API and Whitman. I suggest that that's actually a flaw in his reading of that precedent rather than a flaw in this court's work there. That not only allowed ATA 3, that is, not only allowed consideration of background ozone, but in fact, in a circumstance not so different from this one, the court blessed EPA's there more creative than here solution as to background ozone concerning particulate matter. In that case, the geography was inverted. It was hard for the east to achieve the PM standard and easy for the west, but what EPA did in that case was it set a standard that was achievable everywhere and then turned to regional haze and used a different tool from its toolkit to help solve the problems that persisted on the east coast. You know, we have the sort of rhetorical argument. It's a straw man, of course, but from the briefing and, again, just now that we'd require the standard to be set at the worst level in the country or something like that. What we're asking for is just process improvements, and EPA could frankly do something like it did in ATA 3 or it could set a standard that's defined as background plus 20 parts per billion or whatever. The point is that this lack of creativity is a function of sloppy and hasty rulemaking. One final point, on the subject of the good neighbor provision, the good neighbor provision is very, very cold comfort for states like Nevada and Utah and Arizona that live next door to California because they're already in the most extreme form of nonattainment, as I mentioned in their brief, and we can't voice any more restrictions on them. They don't get more extreme. The good neighbor provision does nothing for the good neighbor. It's actually something of a misnomer. It should be called the bad neighbor provision because it just allows the good neighbor to complain about what's going on next door. And although sort of satisfying, it doesn't do anything to help us realize attainment. With that, the court has three competing approaches to background ozone before today. The environmentalist petitioners say that it can never be considered. The states say that it should be remanded for a rational and consistent approach along the four lines I explained, and EPA says that it can sometimes consider it but not all the time, like range versus value. It can consider some, like international, but not all, like interstate. That's not wise or moderate. It's arbitrary and capricious, and this court should vacate and remand the rule for a more thoughtful rulemaking. Thank you very much. Just one, Jim Beeky, for institute petitioners. Just one quick point. Ms. Bott says you don't need to reach the question of whether EPA may consider background ozone levels in setting the standard. Environmental intervenors say, yes, you should, and you can't do it. But I'd suggest it one way. Give the EPA a shot at whether it never really considered that question, never considered it in the context of looking at if background levels would prevent attainment. When you consider there must be some allowance for manmade emissions, then can EPA consider background? They should look at that first, and then the case can come back. The case can be remanded for that. Just one other thing on the quote that the environmental petitioners or environmental intervenors made about most areas of the country. That's not what the court held in the API case. In that case, in that part of the case, the court was ruling on a decision to reject some documents submitted late by American Petroleum Institute, and it was American Petroleum Institute that said these documents would affect the attainability of ozone in many parts of the country. And the court said that EPA was okay to not let that in. So it's a little miscitation of that. That's it. Anything else? Thank you very much. The case is submitted.
judges: Griffith, Pillard, Wilkins